1   Stephen R. Jaffe   CSBN 49539
2   THE JAFFE LAW FIRM
3   101 California Street
4   Suite 2710
5   San Francisco, CA 94111
6   415.618.0100
7   stephen.r.jaffe@jaffetriallaw.com
8
9   Attorneys for Plaintiff/Relator
10  YOLONDA YOUNG-ARMSTRONG
11
12

SEALED
BY COURT ORDER

FILED

2015 SEP -9 A 10: 47

SUSAN Y. SOONG
CLERK U.S. DISTRICT COURT
N.D. OF CA.

13              UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                      OAKLAND DIVISION

UNITED STATES OF AMERICA *EX REL.*
YOLONDA ARMSTRONG-YOUNG,

     Plaintiff/Relator,

       v.

CARELINK HOSPICE, INC., a California
corporation,

     Defendant.

CASE NUMBER ____ C15- 4095

COMPLAINT FOR DAMAGES:

(1) VIOLATION OF THE UNITED
    STATES FALSE CLAIMS ACT [31
    U.S.C. §§ 3729 *ET SEQ.*];
(2) PAYMENT BY MISTAKE OF FACT;
(3) UNJUST ENRICHMENT;
(4) WRONGFUL RETALIATORY
    TERMINATION - CALIFORNIA
    WHISTLEBLOWER'S ACT [LABOR
    CODE §1102.5(C)]

16
17
18
19
20
21
22
23
24
25

COMPLAINT FOR DAMAGES - 1

## COMPLAINT FOR DAMAGES

Plaintiff/Relator Yolonda Young-Armstrong alleges:

### INTRODUCTION

1. Plaintiff/Relator Yolonda Young-Armstrong ("Young" or "Relator") brings this False Claims Act civil action (with a pendant state-based claim) against Carelink Hospice, Inc. ("Carelink") alleging Carelink knowingly submitted false claims to the Medicare Program for unnecessary hospice services for patients who were not terminally ill. Carelink consistently and deliberately sought to increase the number of patients for whom it could bill for end of life hospice care despite repeated warnings that a substantial portion of its patients were not, in fact, terminally ill and in need of hospice care. Carelink sought out categories of patients that required fewer resources and lived for longer periods of time, thereby maximizing its profits from Medicare, the source of approximately ninety percent of its revenue. Carelink's business practices created a "funnel," whereby the most patients were assured to be admitted to Carelink hospice service (the wide end of the funnel), and Carelink created obstacles to ensure that the fewest patients were discharged (the narrow end of the funnel). A foreseeable result of these policies and practices was that many patients were not terminally ill as is demonstrated by Carelink's medical records.

Plaintiff/Relator confronted Carelink regarding these issues and stated she refused to participate in the creation and maintenance of false records, *i.e.,* that she has provided social work services which, in fact, she had never provided, that its patients were living extended periods of time and/or that many of its patients were not eligible for hospice care at all and/or that its medical records either lacked documentation to support terminal illness, or showed that patients were, in fact, not terminally ill, Carelink's business practices did not change. Instead, in direct retaliation Plaintiff/Relator having refused to engage in unlawful conduct and record-keeping, Carelink severely limited and then terminated Plaintiff/Relator's services. Carelink has continued to inappropriately bill

Medicare for hospice services for patients who were not terminally ill and did not need hospice care.

Since 2012, Carelink has presented claims for Medicare hospice benefits that were false because Carelink's medical records did not support that the individuals were terminally ill and in need of hospice care. By knowingly (as that term is defined in the False Claims Act) presenting these claims, Carelink is liable under the False Claims Act, 31 U.S.C. §§ 3729-33.

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain pendant, common law or equitable claims pursuant to 28 U.S.C. § 1367(a).

3. This Court has personal jurisdiction over Carelink pursuant to 31 U.S.C. § 3732(a). Jurisdiction over Carelink is proper because it can be found in, resides in, and/or has transacted business within this Court's jurisdiction. Moreover, acts that Carelink committed in violation of 31 U.S.C. § 3729 occurred within this district.

4. Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c), and 31 U.S.C. § 3732(a), because Carelink resides in or transacts business in this district.

### PARTIES

5. Plaintiff/Relator is an individual citizen of the United States and sues on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS"). At all times relevant to this Complaint, CMS was an operating division of HHS which administers and supervises the Medicare Program.

6. Plaintiff/Relator is licensed by the State of California as an associate clinical social worker.

COMPLAINT FOR DAMAGES - 3

7.     Plaintiff/Relator was engaged by Carelink in her professional capacity as an MSW-ASW social worker from approximately April of 2015 to June of 2015.  She primarily worked out of Carelink's facility located at 1260 B Street, Suite 375, Hayward, California 94541-2996.  However, she performed her duties and responsibilities at various other locations in the San Francisco Bay Area.

6  Defendant Carelink is a California corporation that maintains a principal place of business in Thousand Oaks, California.

7.  At all times relevant to this Complaint, Carelink was in the business of providing hospice care to individuals who were Medicare participants.

8.  Carelink finances 100% of its hospice operations through receipt of Medicare funds.  Since 2012, Carelink has collected millions of dollars from Medicare for hospice benefits

12. Since at least 2012, Medicare billing numbers for Carelink providers were issued to Carelink Hospice, Inc., which submitted Medicare hospice claims on behalf of the Carelink.

## THE FALSE CLAIMS ACT

13.    The False Claims Act provides, in part, that any entity which knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the United States for damages and penalties. *See* 31 U.S.C. §§ 3729(a)(1), amended by, 31 U.S.C. § 3729(a)(1)(A).

14.  To show that an entity acted "knowingly" under the False Claims Act, the Plaintiff/Relator must prove that the entity, with respect to information: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information.  The Plaintiff/Relator does not have to prove that the entity had the specific intent to defraud the United States.  31 U.S.C. §3729(b), amended by 31 U.S.C. § 3729(b)(1).

COMPLAINT FOR DAMAGES - 4

## THE MEDICARE HOSPICE PROGRAM

### The Medicare Hospice Benefit

15. The Medicare hospice benefit, created by Congress in 1982, is designed to provide terminally ill patients with palliative care (*i.e.*, care intended to optimize quality of life by preventing and relieving suffering) instead of curative care (*i.e.*, care designed to cure an illness or condition).

16. Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395kkk-1, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as the Medicare Program (or "Medicare").

17. The Medicare Program is comprised of four parts. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant). The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes. The benefits covered by Medicare Part A include hospice care, as defined in 42 U.S.C. § 1395x(dd).

18. The Medicare hospice benefit pays for medical, nursing, social, psychological, emotional, and spiritual care intended to make terminally ill Medicare participants as physically and emotionally comfortable as possible prior to their death, while remaining primarily in the home environment. *See* 79 Fed. Reg. 26538, 26541 (May 8, 2014).

19. The Medicare hospice benefit is not reasonable and necessary for a Medicare participant unless the individual is "terminally ill." As generally accepted by the medical community, the term "terminal illness" refers to an incurable, advanced, progressively deteriorating illness. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013). Medicare defines "terminally ill" to mean that an individual has a "medical prognosis that the individual's life expectancy is 6 months or less." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3.

COMPLAINT FOR DAMAGES - 5

20. To receive the Medicare hospice benefit, eligible Medicare participants must "elect" the benefit (*i.e.*, it is *voluntary*). 42 C.F.R. § 418.24. By doing so, they waive their right to Medicare coverage of curative treatment for their terminal illness as well as related conditions. *See* 42 C.F.R. § 418.24(d).

21. For example, a cancer patient who has a life expectancy of six months or less and elects the Medicare hospice benefit will no longer receive Medicare-covered treatment, such as chemotherapy, intended to cure the cancer, but instead will receive palliative care designed to relieve only the pain and suffering associated with the patient's impending death.

22. Electing the Medicare hospice benefit is often a critical decision for a Medicare participant, because, for many Medicare participants, electing the benefit is electing to cease any further curative care for their terminal illnesses.

23. Companies can provide hospice care reimbursable by Medicare wherever the patient resides, which may be a private residence or a health care facility, such as a nursing home or assisted-living facility. If a hospice patient lives in a health care facility, the facility will continue to provide for the patient's daily care needs.

24. Since the inception of the Medicare hospice benefit, Medicare has paid hospices a fixed, per day, per level of care rate, which is intended to cover all hospice services needed to manage the end of life care of the terminal illness and related conditions. *See* 79 Fed. Reg. 26538, 26543 & 26553 (May 8, 2014). For patients receiving routine home care, the hospice is paid the same rate each day regardless of what, if any, services the hospice provides each day. *See* 79 Fed. Reg. 26538, 26553 (May 8, 2014).

25. Originally, Medicare did not pay for hospice benefits beyond 210 days. Since 1990, Medicare has paid for two initial 90-day periods, and then an unlimited number of 60-day periods, but only if the individual remains "terminally ill," meaning that he or she continues

to have a medical prognosis that his or her life expectancy is six months or less. 42 C.F.R. §

418.3; Medicare Benefit Policy Manual, Chapter 9, §§ 10, 20.1.

26. Very long stays in hospice are more profitable for hospice providers than shorter stays. Medicare Payment Advisory Commission, Report to the Congress: Medicare Payment Policy, Chap. 11, *Hospice Services* (Mar. 2012) (hereinafter "2012 MedPac Report"). A hospice's costs of providing care typically are highest at the beginning (when the patient is initially admitted) and end of a patient's hospice stay (when the patient dies). Medicare Payment Advisory Commission, Report to the Congress: Medicare Payment Policy, Chap. 6, *Reforming Medicare's Hospice Benefit* (Mar. 2009) (hereinafter "2009 MedPac Report"). Thus, hospices with longer average stays have lower costs per day. Medicare Payment Advisory Commission, Report to the Congress: Medicare Payment Policy, Chap. 12, *Hospice Services* (Mar. 2014) (hereinafter "2014 MedPac Report").

27. Hospices that have a higher share of patients in nursing facilities and assisted-living facilities have higher profit margins than other hospices. The average length of stay on hospice is higher among Medicare participants who reside in nursing or assisted-living facilities than at home. In addition, having more patients in nursing facilities may reduce costs because of the overlap in responsibilities between the hospice and the facility, and treating patients in a centralized location may reduce the hospice's costs for mileage and travel time. 2014 MedPac Report.

28. From 2000 to 2010, the number of for-profit hospices more than doubled, while the number of non-profit hospices slightly decreased. 2012 MedPac Report.

29. The average length of stay for patients in for-profit hospices is longer than the average length of stay in non-profit hospices. 2012 MedPac Report.

30. Medicare spending for hospice care has increased dramatically in recent years. Between 2000 and 2007, Medicare spending for hospice more than tripled, from $2.9

COMPLAINT FOR DAMAGES - 7

billion to just over $10 billion.  2009 MedPac Report.  Over $15 billion was spent annually on hospice care in 2012.  2014 MedPac Report.

31.   The increase in spending is attributable, in part, to the increased length of stay that hospice providers are billing Medicare for hospice care per patient.  Even though the Medicare hospice benefit is intended for individuals with a life expectancy of six months or less, Medicare spent nearly $8 billion in 2011 (more than half of all hospice spending that year) on hospice care for Medicare participants whose hospice stays exceeded six months.  2014 MedPac Report.

32.   In addition, all healthcare providers like Carelink are obligated to comply with applicable requirements in order to be reimbursed by Medicare under Part A.  When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services.

33.   Carelink has a duty to have a thorough knowledge of the Medicare hospice program, and to properly train and inform its employees regarding the requirements for Medicare coverage of hospice care.

**Conditions of Payment for the Medicare Hospice Benefit.**

34.   All Medicare providers (including Carelink) must deal honestly with the Government and with patients.

35.   All healthcare providers like Carelink are obligated to comply with applicable requirements in order to be reimbursed by Medicare under Part A.  When participating in Medicare, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of Medicare services.

36.   One purpose of the Medicare hospice requirements is to ensure that limited Medicare funds are properly spent on patients whose death is predictably impending and who actually need end-of-life care.

COMPLAINT FOR DAMAGES - 8

37. Accordingly, hospice companies like Carelink are entitled to receive Medicare dollars for hospice care only when such care is "reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C).

38. In order to receive payment from Medicare, a hospice company must certify that the individual is, in fact, "terminally ill." *See* 42 U.S.C. § 1395f(a)(7).

39. As part of the certification requirements, the hospice must ensure that the medical record that the hospice maintains for the individual contains clinical information and other documentation that support that the individual is "terminally ill." *See* 42 U.S.C. § 1395f(a)(7); 42 C.F.R. § 418.22.

40. A hospice company is not entitled to payment for hospice care when its medical records do not support that the individual is "terminally ill" because clinical information and other documentation in the hospice medical record that supports that the individual is "terminally ill" is a condition of Medicare payment for hospice services. *See* 42 C.F.R. § 418.200; 42 C.F.R. § 418.22(b); 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013).

41. The requirements that hospice care be "reasonable and necessary for the palliation or management of terminal illness" and that the hospice's medical record support that the individual is "terminally ill" are in addition to a requirement that a physician certify, based on his or her clinical judgment, that the individual's prognosis is for a life expectancy of six months or less if the terminal illness runs its normal course.

42. Before a hospice submits a claim for payment: (a) a physician must have certified based on the exercise of his or her clinical judgment that the individual's prognosis is for a life expectancy of six months or less; *and* (b) the hospice's medical record must support that the individual is "terminally ill"; *and* (c) the hospice care must be "reasonable and necessary for the palliation or management of terminal illness." *See* 79 Fed. Reg. 26538, 26556 (May 8, 2014); *see also* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 70 Fed. Reg. 70532, 70534-35 (Nov. 22, 2005).

COMPLAINT FOR DAMAGES - 9

43. For a patient's initial hospice admission, the hospice provider must obtain a certification of terminal illness for the individual from both (a) the medical director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent periods, the hospice provider must obtain the certification of terminal illness from either the medical director of the hospice or a physician who is a member of the hospice's interdisciplinary group. *See* 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22(c).

44. The interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor. *See* 42 C.F.R. § 418.56. The interdisciplinary group is responsible for developing and implementing an individualized plan of hospice care for each patient. *Id.*

45. These important Medicare requirements for coverage of hospice care are communicated to hospice providers in the Medicare statute and regulations; the Medicare Benefit Policy Manual, Chapter 9, § 20.1; the Federal Register; and other published guidance.

### Determining Life Expectancy Requires Knowledgeable Application of Clinical Research and Guidelines to Medical Facts.

46. Clinical indicators of a life expectancy of six months or less are set forth in multiple public sources, including Hospice Local Coverage Determinations ("LCDs"), issued by Medicare Administrative Contractors ("MACs," also known as "Medicare claims processors").

47. CMS instructs hospice providers to use Local Coverage Determinations and other clinical tools to determine whether a Medicare participant, based on his or her current clinical status and the anticipated progression of his or her illness, has a prognosis of six months or less. *See* 78 Fed. Reg. 48234, 48247 (Aug. 7, 2013); 79 Fed. Reg. 26538, 26556 (May 8, 2014).

COMPLAINT FOR DAMAGES - 10

48. Some diagnoses, like certain cancers, have an inherent prognosis of a life expectancy of six months or less. However, other conditions do not automatically support that a patient has a life expectancy of six months or less.

49. Patients with Alzheimer's disease, dementia, debility, and other diagnoses, may have a life expectancy of years before signs and symptoms of advanced disease are present. Without the knowledgeable application of clinical research and guidelines, hospices are at risk of admitting and keeping patients who do not have a life expectancy of six months or less.

51. After diagnosis with Alzheimer's, individuals live on average for eight to ten years. Some live as long as 25 years. Local Coverage Determinations and other clinical publications help identify which Alzheimer's patients are clinically likely to have a life expectancy of six months or less. The sources describe end-stage Alzheimer's and medical indicators that Alzheimer's patients are nearing death. The end stage of Alzheimer's disease is characterized by the inability to communicate coherently and eventually to control movement, including swallowing. When individuals with Alzheimer's die, they ordinarily die from infection or injuries caused by the loss of control over movement. Aspiration pneumonia, which can occur when impaired swallowing allows food or liquids to enter the lungs, is the most common cause of death of Alzheimer's patients. Individuals with Alzheimer's are considered to have a life expectancy of six months or less when they suffer certain medical conditions, including serious infections or inability to intake sufficient foods or fluids. *See, e.g.*, Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal Status (L13653); National Institutes on Aging, Alzheimer's disease and end of life issues, August 1, 2003 (updated December 8, 2011), available at http://www.nia.nih.gov/print/alzheimers/features/alzheimers-disease-and-end-life-issues; Tsai S, Arnold R., Fast Facts and Concepts #150, *Prognostication in Dementia*, February 2006 (updated 04/09) www.eperc.mcw.edu/EPERC/FastFactsIndex/ff_150.htm

COMPLAINT FOR DAMAGES - 11

52.   Clinical guidelines are also available to assist in identifying patients who h have a life expectancy of six months or less due to debility. The hospice diagnosis of debility is characterized by progression of disease as documented by worsening clinical status, symptoms, signs, and laboratory results, which in combination cause an irreversible decline in the patient's health such that the patient is not expected to live more than six months. The diagnosis of debility has been used as a terminal diagnosis when a patient experiences such decline related to multiple medical conditions, none of which are deemed terminal by themselves. Whether a patient with debility has a life expectancy of six months or less depends on various medical indicators, such as recurrent or intractable infections, irreversible weakness from lack of nourishment, and deteriorating ability to move and perform activities of daily living (eating, bathing, dressing, and toileting) without assistance. *See, e.g.,* Decline in Clinical Status Guidelines in Cahaba GBA's Local Coverage Determination for Hospice Determining Terminal Status (L13653). Such indicators would routinely be noted in the patient's medical records. In 2013, CMS issued guidance that debility and adult failure to thrive should no longer be used as principal hospice diagnoses because these diagnoses "are incongruous to the comprehensive nature of the hospice assessment, the specific, individualized hospice plan of care, and the hospice services provided." 78 Fed. Reg. 27823, 27832 (May 10, 2013).

53.   CMS also has instructed hospice providers that an individual should be considered for discharge from the Medicare hospice benefit if he or she improves or stabilizes sufficiently over time while on hospice, such that he or she no longer has a life expectancy of six months or less. *See* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010).

### How Hospice Providers Obtain Payments from Medicare.

54.   The United States, through CMS, reimburses Medicare providers with payments from the Medicare Trust Fund, which is supported by American taxpayers. CMS, in turn, contracts with Medicare claims processors to review, approve, and pay

COMPLAINT FOR DAMAGES - 12

Medicare bills, called "claims," received from health care providers like Carelink.  In this capacity, the Medicare claims processors act on behalf of CMS.55. Payments typically are made by Medicare directly to the health care provider rather than to the Medicare participant, who usually assigns his or her right to Medicare payment to the provider.

56.    Since January 1, 2007, multiple Medicare claims processors have processed Medicare hospice claims submitted by Carelink.

57.    Hospice providers like Carelink are reimbursed based upon their submission of an electronic or hard-copy claim form called a "CMS-1450 form."

58.    When a hospice provider submits a Medicare hospice claim, it certifies and represents that it is entitled to payment for the claim.

59.    On the CMS-1450 form, the hospice provider must state, among other things, the patient's name, the diagnosis supporting the patient's admission to hospice, and the beginning and ending dates of the period covered by the bill. *See* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims.

60.    On the claim form, the provider certifies that the billing information on the claim is "true, accurate, and complete"; that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file"; and that "[r]ecords adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law."

61.    Because it is not feasible for the Medicare program, or its contractors, to review every patient's medical records for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements, and trusts the providers to submit truthful and accurate claims.

62.    Once the provider submits its CMS-1450 form to the Medicare claims processor, in most cases, the claim is paid directly to the provider without any review of the patient's medical record.

COMPLAINT FOR DAMAGES - 13

63.   The physician certifications and clinical information in the medical record are submitted to the Medicare claims processor only if the claim is selected for medical review, which does not happen routinely. *See generally* Medicare Claims Processing Manual, Chap. 11, Processing Hospice Claims, and Medicare Program Integrity Manual, Chap. 3, Verifying Potential Errors and Taking Corrective Actions.

64.   If a hospice claim is selected for medical review, the hospice provider (such as Carelink) is required to submit to Medicare the physician certifications and clinical information in the medical record supporting the claim.

65.   The Medicare claims processor may not pay the claim if the clinical information that the hospice submits for medical review does not support that the patient is actually terminally ill and in need of hospice care.

66.   Federal law requires providers like Carelink, which receive funds under the Medicare program, to report and return any overpayments within time periods specified by the Government.  42 U.S.C. § 1320a-7k(d).

## CARELINK KNOWINGLY PRESENTED OR CAUSED TO BE PRESENTED FALSE CLAIMS TO MEDICARE TO OBTAIN PAYMENTS.

67.   Carelink knowingly (as that term is used in the language of the False Claims Act statute) asked the Medicare program to pay amounts to which Carelink was not entitled by presenting or causing to be presented false claims for hospice care for individuals for whom Carelink's medical records did not support terminal illness and a need for end-of-life care.

**A.    Carelink Knew or Should Have Known That its Policies Caused it to Obtain Patients Who Were Less Expensive to Care for and Who Were Less Likely to be Terminally Ill.**

68.    Carelink knew many of its patients had very long lengths of stay and that its proportion of patients with Alzheimer's, dementia, or debility was higher than was normal or average for hospices.

**Carelink Pressured its Staff to Admit and Retain Patients Without Care And Attention to Their Eligibility for Hospice.**

69.    Carelink pressured and encouraged all its employees, including physicians, nurses, social workers and support staff, to maximize the number of patient admissions and the total number of patients "census") without care, regards or attention to whether the patients were eligible for Medicare hospice benefits.

**B.    The Top of the Funnel:  Carelink Aggressively Admitted Patients into Hospice Without Ensuring and Supporting Their Eligibility.**

70.    During the relevant time period, Carelink employed procedures and policies designed to cause the admission of virtually every patient who applied to it for hospice care, regardless of the patients' eligibility for hospice care. used the following general procedure when initially enrolling a patient for the Medicare hospice benefit.  Under these policies and procedures, Carelink knowingly submitted false claims to Medicare for services to patients who were not terminally ill.

71.    Carelink's nurses were critical to the admission and retention process for patients because they were responsible for seeing the patients, assessing whether the patients should be admitted, documenting the patients' conditions in the medical records, and orally communicating to the doctors the patient information on which the doctors relied to certify and recertify the patients as terminally ill.

COMPLAINT FOR DAMAGES - 15

72.  Rather than hiring nurses and other clinical staff experienced in assessing the life expectancy of patients with Alzheimer's disease, dementia, and debility, Carelink often hired nurses with little or no prior hospice experience.

73.  Carelink also failed to adequately train its staff to identify terminally ill patients. It did not provide its staff comprehensive training on the identification of hospice-eligible patients with Alzheimer's disease, dementia, and debility, and the clinical progression of these illnesses.

74.  The Plaintiff/Relator is informed and believes and thereupon alleges that the Carelink Medical Director signing the Certification of Terminal Illness was not always the same Medical Director who provided the verbal order to admit.

75.  The Plaintiff/Relator is informed and believes and thereupon alleges that The Carelink Medical Director signing the Certification of Terminal Illness frequently signed the certification without seeing the patients.

76.  Not only were Carelink's admissions policies likely to lead to inappropriate *admissions* to hospice, but also Carelink's recertification process predictably led to the *retention* of non-terminally ill patients in hospice.

**C.  The Bottom of the Funnel:  Carelink Failed to Ensure the Continuing Eligibility of the Patients it Admitted and Recertified as Terminally Ill.**

77.  This procedure demonstrates that Carelink knowingly submitted false claims to Medicare for patients who were not terminally ill.

78.  The Carelink Medical Director who signed the Certification of Terminal Illness for recertification frequently did not physically examine the patient.  Thus, that Medical Director necessarily relied on oral reports of nurses during the interdisciplinary group meeting and the medical records for the patient.  The nurses the Medical Director relied on are the same under-trained and pressured nurses discussed in the prior allegations.

COMPLAINT FOR DAMAGES - 16

79.   Carelink's medical records were inaccurate and often lacking in the information and detail necessary to support a hospice determination.

80.   Rather than providing detailed, individualized visit information, there was duplication ("copying and pasting") within a patient's medical record of clinical notes describing the patient's condition.  These conference notes became inconsistent with other contemporaneous clinical notes.

81.   There were untimely entries of clinical notes in medical records.

82.   Carelink did not adequately act to correct or address this issue.

83.   Carelink failed to ensure that its nurses documented accurate and complete information about the patients' medical conditions in the medical records.

84. Carelink failed to ensure that its nurses communicated accurate and complete information about the patients' medical conditions to Carelink's physician Medical Directors.

85.  Carelink received multiple staff complaints that it was admitting and recertifying patients who were not terminally ill.

86. Carelink had a policy that required all Medical Directors' plans to discharge patients to be reviewed by management.

87. There was no similar policy that required management review of patients that were recertified for Carelink hospice.

88. Carelink also knowingly challenged or disregarded Medical Directors' decisions that patients were not terminally ill and should be discharged.

**D.   The Plaintiff/Relator personally witnessed multiple violations of Medicare rules and regulations for which false and fraudulent claims were made to Medicare.**

89.   During her brief tenure working at Carelink, the Plaintiff/Relator personally witnessed multiple and continuing violations of Medicare rules, policies, procedures and

regulations which were required to make Carelink eligible to receive Medicare funds. These violations included, but were not limited to:

(a) In April of 2015, in anticipation of a forthcoming Medicare audit, Plaintiff/Relator was told by Intake Coordinator (Jan) to sign a stack of IDG meeting notes indicating she (the Plaintiff/Relator) had delivered social work services to patients whom she had never seen. Some of the documents bore dates in 2014, long before Plaintiff/Relator began to work at Carelink. Plaintiff/Relator initially refused but, fearing for the loss of her job, she initially complied. After considering what she had done, Plaintiff/Relator went back to Jan and said she wished to rescind her signatures on the documents. Jan told Plaintiff/Relator, "Too bad, there is nothing you can do now," and that she (Jan) was only doing what she had been directed to do by Regina (Director of Nursing);

(b) Prior to hiring Plaintiff/Relator, Carelink had never has a full-time MSW on its staff with a regular caseload and schedule of patient visits, causing the social work records to be incomplete, inaccurate, in disarray and out of compliance with Medicare standards;

(c) The IDT meetings were not fully staffed in compliance with Medicare rules and regulations;

(d) Medicare rules and regulations certifying recently admitted patients as being "terminally ill" and therefore eligible for hospice care and Medicare funding were not followed;

(e) On a visit to a patient in a nursing facility, Plaintiff/Relator observed the patient was missing an oxygen tank which has been ordered by the patient's doctor. When the Plaintiff/Relator inquired about the missing oxygen tank, she was told by the facility's nursing staff that someone from Carelink had removed the tank and given

COMPLAINT FOR DAMAGES - 18

it another Carelink patient.  Such switching of prescribed medical equipment was forbidden by Medicare rules and regulations;

(f) Carelink failed to have two physicians certify incoming patients as being "terminally ill" within two days of their admission;

(g) Medicare requires a "Hospice Item Set" ("HIS") be completed for each patient in its care and electronically transmitted to Medicare. Although HIS forms are customarily completed by a social worker, Plaintiff/Relator was never asked to complete a HIS nor did she ever see an HIS in any chart on which she worked at Carelink;

(h) Medicare requires every patient be visited by a registered nurse not less than twice a week.  Plaintiff/Relator observed that Medicare requirement was not followed at Carelink;

(i) Carelink did not have a permanent nutritionist on it staff;

(j) Plaintiff/Relator observed medications and other physician-ordered necessities were often delivered late to patients, causing needless patient suffering;

(k) Carelink failed to investigate reports of patient neglect and abuse, including an alleged sexual assault, which incidents were presented at IDT meetings;

(l) Carelink violated HIPPA rules and regulations by transmitted patient names and medical information via unsecured text messages;

(m) Plaintiff/Relator personally observed multiple patient charts which contained no certificate of terminal illness.

**CARELINK'S PRESENTATION OF FALSE CLAIMS TO MEDICARE CAUSED THE GOVERNMENT TO PAY CARELINK MONEY.**

90. From at least 2012, Carelink has collected federal funds from Medicare for hospice benefits. Much of that revenue was derived from hospice patients with stays exceeding six months.

## FIRST CAUSE OF ACTION
### Violation of US False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

91. Plaintiff/Relator re-alleges and incorporates by reference the allegations of paragraphs 1 through 90.

92. By virtue of the acts described above, Carelink knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent Medicare claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), amended by 31 U.S.C. § 3729(a)(1)(A); that is, Carelink knowingly made or presented, or caused to be made or presented, to the United States claims for payment for hospice services for Medicare participants who were not terminally ill and for whom hospice services were not reasonable and necessary.

93. By reason of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and not more than $11,000 per false claim. Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## SECOND CAUSE OF ACTION
### (Payment by Mistake Of Fact)

94. The Plaintiff/Relator re-alleges and incorporates by reference the allegations of paragraphs 1 through 93.

COMPLAINT FOR DAMAGES - 20

95.  This is a claim for the recovery of monies paid to Carelink by mistake for Medicare participants who were not terminally ill and for whom hospice services were not reasonable and necessary.

96.  As a consequence of the conduct and the acts set forth above, Carelink was paid by mistake by the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment)

97.  The Plaintiff/Relator re-alleges and incorporates by reference the allegations of paragraphs 1 through 96.

98.  This is a claim for recovery of monies by which Carelink has been unjustly enriched.

99.  By virtue of the conduct and the acts described above, Carelink was unjustly enriched at the expense of the United States in an amount to be determined, which, under the circumstances, in equity and good conscience, should be returned to the United States.

## FOURTH CAUSE OF ACTION

### (Unlawful Retaliation/Wrongful Termination

### California Whistleblower's Act Labor Code Section 1102.5(c))

100.  The Plaintiff/Relator re-alleges and incorporates by reference the allegations of paragraphs 1 through 99.

101.  Carelink's adverse employment action against the Plaintiff/Relator terminating her services was solely motivated by Plaintiff/Relator refusal to participate in the unlawful conduct of Carelink as alleged in this complaint.  As such, it violated California Labor Code Section 1102.5(c)

COMPLAINT FOR DAMAGES - 21

102.  As the direct result of Carelink's violation of Labor Code Section 1102.5(c), plaintiff has been damaged in a sum in excess of $25,000 to be proved at the time of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff/Relator prays for judgment in her favor as follows:

1. On the First Cause of Action (False Claims Act),

    (i) statutory damages in an amount to be established at trial, trebled as required by law, and such penalties as are required by law;

    (ii) the costs of this action, plus interest, as provided by law;

    (iii) for Plaintiff/Relator's reasonable attorney fees;

    (iv) for costs of suit;

    (v) for such other statutory benefits and consideration as may be available under the False Claim Act on account of the Plaintiff/Relator having initiated this *qui tam* action; and

    (vi) such other and further relief the Court deems just and appropriate.

2. On the Second Cause of Action (Payment Under Mistake of Fact), for:

    (i) an amount equal to the money paid by the United States through the Medicare Program to Carelink, and illegally retained by Carelink, plus interest;

    (ii) the costs of this action, plus interest, as provided by law; and

    (iii) any other relief that this Court deems appropriate, to be determined at a trial by jury.

3. On the Third Cause of Action (Unjust Enrichment), for:

    (i) an amount equal to the money paid by the United States through the Medicare Program to Carelink, or the amount by which Carelink were unjustly enriched, plus interest;

COMPLAINT FOR DAMAGES - 22

(ii) the costs of this action, plus interest, as provided by law; and (iii) such other relief this Court deems appropriate.

4. On the Fourth Cause of Action (Violation of the California Whistleblower Act), for

    (i)    damages in excess of $25,000 in an amount to be established at trial,

    (ii)   the costs of this action, plus interest, as provided by law;

    (iii)  for Plaintiff/Relator's reasonable attorney fees;

## JURY DEMAND

THE PLAINTIFF/RELATOR DEMANDS A JURY TRIAL ON ALL CLAIMS.

Dated: September 9, 2015

                                      THE JAFFE LAW FIRM

                                      By:

                                        Stephen R. Jaffe
                              Attorneys for Plaintiff/Relator
                           YOLONDA YOUNG-ARMSTRONG